# IN THE COURT OF APPEALS OF IOWA

No. 24-0358
Filed February 19, 2025


**JESSIE LEE MATHEWS,**
    Applicant-Appellee,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellant.
_____


Appeal from the Iowa District Court for Black Hawk County, Joel Dalrymple, Judge.


The State appeals from the district court's grant of postconviction relief to the petitioner. **REVERSED AND REMANDED WITH DIRECTIONS.**


Christopher A. Kragnes, Sr., of Kragnes & Associates, PC, Des Moines, for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant Attorney General, for appellee State.


Heard by Schumacher, C.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

Jessie Mathews was convicted of first-degree robbery after he and three accomplices robbed a Burger King in Waterloo. Mathews' girlfriend, Monika Bray, pointed the finger at Mathews a few days later. Bray testified against Mathews at his jury trial after being granted immunity by the State for any role she had in the robbery, as well as an earlier robbery the parties called the "Craigslist robbery." During her testimony, Bray implicated Mathews in the Craigslist robbery.

On postconviction relief, Mathews claimed defense counsel was ineffective for failing to object to Bray's testimony and the prosecutor's references to the prior robbery in closing arguments. The district court granted Mathews a new trial, finding defense counsel performed deficiently to Mathews' prejudice. The State appeals.

## I.      Background Facts and Proceedings

In April 2014, Jessie Mathews lived in an apartment in Waterloo with his girlfriend, Monika Bray. Neither was employed. They had quit their jobs in February, after Bray received her income tax refund. But the money didn't last long. By April, Bray said the refund was gone and "things got hard": "We didn't have jobs. We had rent, all kinds of bills."

Around the same time, Mathews and Bray drove to his hometown of Gary, Indiana, and brought three of Mathews' friends back with them—Charles Jenkins, Tyler Chandler, and Andrew Hodges.[1] They wanted to "get out of Gary" and find work in Waterloo. Instead, they spent most of their time drinking, smoking, and

---

[1] Hodges is also referred to as Andrew Hodge in the record.

partying at the apartment. Mathews and his friends also messed around with two guns they brought with them from Indiana—a revolver with a wooden handle that had tape on it and a black or silver handgun. The revolver was described as having a "spinny thing."

On April 23, Mathews and his three friends left the apartment after Mathews had an argument with Bray. When Bray asked Mathews where he was going, Mathews answered: "to get some money." Mathews was wearing a "black thing" with a zipper that covered his head. And earlier that day, Bray saw Hodges with one of the guns. Mathews stopped at his brother's house with his friends, where Hodges pulled Jenkins aside to ask him if he wanted to make $100. Jenkins said yes, and Hodges told him "to go to Burger King and basically just, like, scope it out for them and to leave the door open" so they could get in. The Burger King was about a five- to ten-minute drive from Mathews' brother's house.

Around 10:30 p.m., the four friends drove to Burger King. They dropped Jenkins off in the parking lot, and he went into the restaurant. Mathews, Chandler, and Hodges stayed in the car. A receipt showed that Jenkins ordered a cheeseburger, fries, and a drink at 10:48 p.m. Stalling for time, he sat down to eat and texted Hodges that there were two males and one female working. While Jenkins was eating, one of the employees locked the door to the lobby because the inside of the restaurant closed at 11:00 p.m., although the drive-through stayed open until midnight. About thirty minutes after he got his food, Jenkins got ready to leave. He texted Hodges, "It's sweet," which Jenkins testified at Mathews' trial meant, "com[e] in now. Ain't nobody here, basically." On his way out of the restaurant, Jenkins left a to-go bag with his half-eaten cheeseburger in the

emergency exit door, propping it open for his friends. Then he walked back to Mathews' brother's house.

Minutes after Jenkins left, three masked individuals ran into the restaurant. The female employee was cleaning the restrooms when they rushed in, but the other two employees were out front. The robbers jumped over the counter and yelled, "This is a robbery, get on the ground." The employees testified they saw two guns. One was a black-barreled revolver with a handle that was "worn down," "look[ed] as if it was made of wood," and had a "spinning wheel." The other was an automatic handgun with a slide. One of the robbers went to the back office to grab the money—a total of $944—while the other two hit and kicked the employees on the ground. The robbers were in and out in less than two minutes. The employees called the police, who collected the to-go bag with the cheeseburger in it for possible DNA testing.

Jenkins met up with Mathews, Chandler, and Hodges back at Mathews' brother's house. Hodges gave Jenkins $100 and then the four friends left for Indiana. When Mathews returned to Waterloo a few days later, Bray argued with him, wanting to know where he had been and whether he was involved with the Burger King robbery that had been on the news. Mathews called her ungrateful, threw cash at her, and said, "You wanted your bills paid." Bray asked Mathews where he was getting the money, and he told her that it was none of her business. But Bray kept asking for details. Mathews told her that "he was covered," and "they wouldn't know he was there." He also laughed about Jenkins leaving a half-eaten cheeseburger in the door to keep it open for them. And he told Bray that when they went into the restaurant, they jumped over the counter, which he said was

fun. Mathews also told Bray that they had two guns during the robbery and that he beat one of the employees up while Hodges got the money.

The couple's discussion about the robbery escalated into a physical fight. A neighbor called the police, and Bray was taken to the hospital as a precaution because she was pregnant. While there, Bray told the police that Mathews and his friends were involved in the Burger King robbery. She knew details about the robbery that had not been in the news, including how the robbers got into the restaurant. With the information from Bray, an investigator from the Waterloo police department tracked Jenkins and Chandler down in Indiana, but Hodges was never found. The investigator obtained a buccal swab from Jenkins, which matched the DNA profile developed from a swab of the cheeseburger.

Mathews, Chandler, and Jenkins were charged in a joint trial information with first-degree robbery. Jenkins accepted a plea deal from the State in exchange for his testimony against his friends. Bray also agreed to testify against Mathews and Chandler after being granted immunity by the State from prosecution for the Burger King robbery, an earlier "Craigslist robbery" that she referenced in a sworn statement to the police, and seven violations of a no-contact order with Mathews.

Chandler was tried before Mathews. His defense counsel succeeded in excluding any mention of the Craigslist robbery that "Chandler may or may not have been involved in," while still being able to cross-examine Bray about her deal with the State. The prosecutor agreed not to mention the other robbery, and the court ruled: "I think that's fair to explore the credibility of her testimony and the witness's biases. Both of you can deal with that issue without mentioning Mr. Chandler's potential involvement in another robbery, and that's what I expect both

counsel to do."  In line with that ruling, Chandler's attorney asked Bray on cross-examination, "And have you also been told that in an unrelated robbery, that there would be no attempts to charge you out of that?"  Bray answered, "Yes."

Mathews' defense counsel took a different tack at Mathews' jury trial in February 2017, with the same prosecutor and judge involved in Chandler's trial.  Seemingly unaware of the successful evidentiary ruling in that trial,[2] Mathews' attorney did not seek a pretrial ruling to exclude the Craigslist robbery because, as he explained at the postconviction-relief hearing, "I believed it would have come in anyway and I prepared my cross-examination based on that premise."

During the State's direct examination of Bray at Mathews' trial, the prosecutor asked: "And did the State also agree not to charge another incident in which you were involved with Mr. Mathews?"  Bray answered, "Yeah."  The prosecutor did not ask for any more details about that incident on direct examination.  But on cross-examination, defense counsel asked Bray:

> Q. Also, Mr.—towards the end of his [questioning], [the prosecutor] indicated there was another matter?  A. Yep.
> Q. And you weren't prosecuted for that either?  A. Yep.
> Q. Is that of a similar level of seriousness as the case we're here on today?  A. Yeah

Defense counsel continued with that same line of questioning later:

> Q: The other matter that [the prosecutor] referred to that you were, as part of your agreement to testimony, not charged with, was that also a robbery of some sort?  A. Yes.
> Q. And you admitted your part in that.  A. Yes.
> Q. So you have some idea of what a robbery involves.  A. Yeah.
> Q. Did it involve a gun, the other one?  A. Which one?

---

[2] Although Mathews' attorney thought that he sat in on a couple of days of Chandler's trial, he did not request a transcript.

Q. The one that you—that isn't this one. The other one you received immunity from. A. Yeah.

Q. It did involve a gun? A. Yes.

Q. Okay. Did it have a spinny thing? A. It was the same two.

Q. Okay. I'm sorry, the same two what? A. That we talked about earlier. The black one and the one with the spinny thing, yes.

Q. You were involved in a robbery involving the same two weapons that we're talking about in the context of these allegations? A. I mean, I didn't touch the guns and I had nothing to do with it—

Q. But they were the same guns. A. Yeah.

With that opening, the prosecutor followed up on the Craigslist robbery during his redirect examination of Bray:

Q. You talked about another incident in which you'd been agreed not to be charged, and that had the same two guns . . . involved that were in this case; is that correct? A. Yes.

Q. And did that case also involve the same individuals in the Burger King robbery? A. Yes.

. . . .

Q. Were Mr. Mathews and the other individuals involved in that? A. Yeah.

Q. And is that case a case that's titled sort of the Craigslist robbery? A. Yeah.

Q. And were you used as bait in that robbery? A. Yes.

Defense counsel did not object to any of these questions, or the prosecutor's mentions of the Craigslist robbery in his closing arguments. Instead, counsel argued in closing that "[p]erhaps Ms. Bray was the mastermind of the whole thing and has constructed this story to incriminate Mr. Mathews," pointing out that she got "zero years" out of a possible "53 1/2 years."

The jury found Mathews guilty of robbery in the first degree. We affirmed his conviction on direct appeal, preserving for possible postconviction-relief proceedings Mathews' claims that "counsel was ineffective for raising the issue of the Craigslist robbery and for failing to object to statements by the prosecution

regarding his participation in the Craigslist robbery." *State v. Mathews*, No. 17-0519, 2018 WL 2084831, at *2 (Iowa Ct. App. May 2, 2018).

Mathews applied for postconviction relief in March 2019, asserting defense counsel was ineffective for failing to (1) "object to prosecutor conduct," (2) "investigate facts," and (3) "put the case of the State to any type of meaningful adversarial type testing." At the hearing on his application in January 2024, Mathews explained the first ground was for his attorney's failure to object to the prosecutor's questioning of Bray about the uncharged Craigslist robbery. Mathews did not remember his attorney "even address[ing] the Craigslist as far as who was involved or anything like that." Putting a finer point on it, the State asked on recross-examination, "you are not alleging that [defense counsel], at any time during his cross of Ms. Bray, ever did anything inappropriate?" Mathews answered, "My issue is with him not objecting to that. That's . . . the issue I'm raising."

Mathews' attorney defended his handling of the testimony about the Craigslist robbery, testifying at the postconviction-relief hearing that based on his experience with the trial judge, "I didn't think a motion in limine would be granted." So, counsel continued, "I would have said okay, this is going in so I will deal with it in cross." And in counsel's estimation, "if the jury does not find [Bray] credible," the effect of that prior bad act "would be moot."

The district court concluded otherwise:

> The failure to object to the prosecution's introduction of Mathews' involvement in the crimes Bray received immunity from is problematic. If objected to, a mistrial was a distinct possibility. The strategy to impeach Bray with the nature of the crimes she was immune from was legitimate and effective. To detail the number of

crimes was effective. To detail the severity of the crimes was effective. To detail the punishment avoided was effective. However, implicating the defendant on trial for the crime of robbery in a separate and distinct robbery is where [the judge] drew the line in the Chandler trial. The undersigned concurs. The fact defense counsel implicated Mathews or compounded [the prosecutor's] implication of Mathews in the Craigslist robbery worked to Mathews' actual and substantial disadvantage. To highlight in the Craigslist robbery the use of the very same weapons used in the Burger King robbery did little to impeach Bray but connected Mathews to a robbery the jury would otherwise be unaware of.

Because of the "totality of the issues outlined above," the court granted Mathews postconviction relief.

The State moved to enlarge or amend the court's ruling, arguing in part that the "evidence was strong in this case, and even if the brief references to an additional crime were excluded from evidence, the outcome of this case was based upon strong evidence regarding" Mathews' guilt. The court denied the motion, ruling: "Despite the strength of [the] evidence, the Court finds a substantial right of the defendant was affected. . . . [C]ounsel's collective errors were so serious to deprive the defendant of a fair trial, a trial whose results were reliable."

The State appeals, claiming the district court erred in (1) finding that Mathews established both prongs of his ineffective-assistance claim and, in the alternative, (2) granting the application based on defense counsel's implication of Mathews in the Craigslist robbery because that issue was not raised by Mathews.

## II. Standard of Review

Postconviction relief proceedings are normally reviewed for correction of errors at law. *See* Iowa R. App. P. 6.907; *Krogmann v. State*, 914 N.W.2d 293, 306 (Iowa 2018). But when the application raises a constitutional claim, such as

ineffective assistance of counsel, we review the proceedings de novo. *Sothman v. State*, 967 N.W.2d 512, 522 (Iowa 2021).

## III. Analysis

To establish his claim of ineffective assistance, Mathews was required to prove (1) his counsel failed to perform an essential duty and (2) prejudice resulted. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018). We find it unnecessary to determine whether defense counsel performed deficiently in his handling of the Craigslist robbery because Mathews' claim fails on the second prong—*Strickland* prejudice. *See State v. Maxwell*, 743 N.W.2d 185, 196 (Iowa 2008) ("[I]f the claim lacks the necessary prejudice, we can decide the case on the prejudice prong of the test without deciding whether the attorney performed deficiently.").

The prejudice prong of the *Strickland* test requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The most important factor under the test for prejudice is the strength of the State's case." *State v. Carey*, 709 N.W.2d 547, 559 (Iowa 2006). "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696.

On our de novo review, we find overwhelming evidence of Mathews' guilt. *See State v. Navarrette*, No. 14-0662, 2015 WL 1817041, at *2 (Iowa Ct. App. Apr. 22, 2015) (finding no reasonable probability of a different outcome had defense counsel objected to prior bad acts evidence given the overwhelming

evidence of defendant's guilt). As the State summarizes on appeal, Bray's testimony established that Mathews left the night of the Burger King robbery "to get money, with 'a black thing' on his face, returned days later with more money and fewer guns, and admitted, in great, not-yet-public detail, to the crime." Those details included how the door to the restaurant was propped open: with a to-go bag that had Jenkins' half-eaten cheeseburger in it. DNA recovered from that cheeseburger matched Jenkins' profile. Jenkins testified at trial that he drove to Burger King with Mathews, Chandler, and Hodges, with the plan that he would scope out the restaurant and leave a door open. Shortly after Jenkins left the restaurant, three masked men ran in. Two of them were carrying guns—and one of the guns was distinctive. The employees described that gun as a revolver with a "spinning wheel" and a "worn down handle" that looked like it was made of wood. Bray and her sister told police investigators that Mathews and his friends had the same type of gun before the robbery. Bray also knew from Mathews that once they were inside the restaurant, the men jumped over the counter, and Mathews "beat somebody up." Surveillance cameras from inside the restaurant showed the same thing.

While not determinative, we have also considered that Chandler was convicted of first-degree robbery with many of the same witnesses and much of the same evidence—except for the references to the Craigslist robbery.[3] And we note that Mathews does not challenge the State's overwhelming-evidence argument in his brief on appeal. Instead, he asserts that "[a]lthough the district

---

[3] The district court took judicial notice of the exhibits, pleadings, and transcripts from Chandler's trial.

court conceded the evidence against Mathews was reasonably substantial, the evidence should have been presented to the jury in a constitutional manner." But that's not the *Strickland* standard for prejudice. *See Wanatee v. Ault*, 101 F. Supp. 2d 1189, 1197 (N.D. Iowa 2000) (holding that, under *Strickland*, "the standard for 'prejudice'" is not whether the applicant "has shown that he did not have a *fair trial*"). The governing inquiry is "the reasonable probability of a different result." *Ledezma v. State*, 626 N.W.2d 134, 144 (Iowa 2011); *accord Wanatee*, 101 F. Supp. 2d at 1197.

Under that standard, we conclude there is no reasonable probability the outcome of the trial would have been different had defense counsel objected to—or not elicited—testimony about Mathews' involvement in the Craigslist robbery given the overwhelming evidence of his guilt.[4] We accordingly reverse the district court's ruling granting Mathews a new trial and remand for the court to consider the remaining ineffective-assistance claims it did not previously address.

**REVERSED AND REMANDED WITH DIRECTIONS.**

---

[4] The State is correct that in reaching a different conclusion, the district court considered issues that were not pled or argued by Mathews, including defense counsel's "repeated introduction of prior bad acts of the Defendant Mathews." Mathews was clear at the postconviction-relief hearing that he was only challenging defense counsel's failure to object to the prosecutor's questions and closing arguments that linked him to the Craigslist robbery. In any event, we find Mathews' claim fails on the prejudice prong no matter who elicited the evidence. So we need not address this assignment of error.